**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

Filed/Docketed
Jul 24, 2012

IN RE:

**ATLAS COMPUTERS, INC.,**

      **Debtor.**

**Case No. 07-11665-M**
**Chapter 7**

**MEMORANDUM OPINION**

An army runs on its stomach.[1]  The American system of bankruptcy runs on its compromises. In furtherance of this principle, bankruptcy trustees are given discretion to settle disputes that arise in the course of a case.  As a backstop, the matter is presented to a bankruptcy judge.  The bankruptcy judge determines whether the trustee has properly exercised his or her discretion in entering into the compromise.  If so, the compromise is approved.  If not, the parties are sent back to the drawing board.

In this case, the Chapter 7 debtor is a defunct internet service provider.  Shortly before the filing of the bankruptcy case, the assets of the debtor were transferred to a third party, who then transferred the assets to another company that provides internet services.  Upon learning of the transaction, the trustee sued to recover the property.  On the eve of trial, the trustee and the transferees reached a settlement.  The settlement has drawn one objection from parties who, not coincidentally, have been fighting with the debtor and its principals for years.  They argue that the settlement is inadequate, claiming the trustee has settled for a pittance when he is entitled to a fortune. Not surprisingly, those who made the deal disagree.  The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal

---

[1]  An oft-used quote commonly attributed to Napoleon Bonaparte.
http://www.brainyquote.com/quotes/quotes/n/napoleonbo130788.html

Rule of Civil Procedure 52, which are made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

## Jurisdiction

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C.A. § 1334(b).[2] Reference to the Court of the bankruptcy case is proper pursuant to 28 U.S.C.A. § 157(a).  The approval of a compromise constitutes a core proceeding as defined by 28 U.S.C.A. § 157(b)(2)(A).

## Findings of Fact

The conflict before the Court is rooted in events spanning the last 15 years.  The players are Noble Sokolosky ("Sokolosky"), Dominion Corporation ("Dominion"), Dominion Communications LLC ("Communications"),  Atlas Computers, Inc. ("Atlas" or "Debtor"); and Brad Finley, Ryan Finley, and Perry Quality Services, Inc. (collectively, the "Finley Claimants").  Sokolosky is an individual.  Dominion is an Oklahoma corporation with its principal place of business in Owasso, Oklahoma, that is owned and controlled by Sokolosky.  Communications is an Oklahoma limited liability company with its principal place of business in Owasso, Oklahoma, owned by Dominion. Sokolosky is also a manager of Communications.  The Finley Claimants are two individuals and a corporation who claim that all of the other players owe them a large sum of money, as detailed later herein.

At all relevant times, the day to day operations of Atlas were conducted by Milos Milenkovic ("Milenkovic").  Milenkovic is an electrical engineer.  He formed Atlas in 1998 and has been in the internet service provider business ever since.  In the course of his work with Atlas, Milenkovic

---

[2]  Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq*.

devised new and unique means of providing internet services to rural areas.  During his testimony at trial, Milenkovic made a game attempt to explain in layman's terms the processes that he created.  Though he was largely unsuccessful, the complexity of the processes is not lost on the Court.  The Court finds that, for all practical purposes, Milenkovic, his intellect, and the processes he developed were the economic heart and soul of Atlas.

At various times between 2003 and 2006, Atlas was in need of funds.  Some of the funds were needed for the acquisition of capital assets, while other monies were necessary to cover operating expenses or for the payment of taxes.  On behalf of Atlas, Milenkovic approached Sokolosky and asked for financial support.  In response, Sokolosky and Dominion transferred approximately $668,000.00 to Atlas between July 16, 2003, and October 18, 2006.  Sokolosky and Milenkovic both referred to these transfers of funds as "loans."  However, there is no evidence that any promissory notes or other evidence of indebtedness reflecting these "loans" were executed prior to February 15, 2007.

On February 15, 2007, Atlas executed and delivered to Sokolosky a "Demand Promissory Note" in the amount of $718,503.07 (the "Note").  As part of the same transaction, Atlas executed and delivered to Sokolosky a Security Agreement (the "Security Agreement") pledging, as security for the Note, all of Atlas's accounts receivable, intangibles, inventory, machinery, equipment, furniture, and fixtures, together with all proceeds of those items (the "Property").  No new monies were advanced at the time of the execution of the Note and Security Agreement.

On June 1, 2007, Sokolosky registered a trade name for Atlas, Advanced Networking Systems, Inc. ("ANS").  Three days later, on June 4, 2007, Sokolosky filed a petition against Atlas using the ANS name in the District Court of Rogers County, Oklahoma (Case No. CJ-2007-342) (the

"Rogers County Foreclosure").  Sokolosky testified that he named ANS instead of Atlas in the Rogers County Foreclosure so that Atlas's customers would not become concerned about loss of their services. Using the Rogers County Foreclosure, Sokolosky foreclosed the Note and Security Agreement and obtained a judgment against Atlas in the amount of $735,850.67 plus interest (the "Judgment").  Atlas and Milenkovic consented to the foreclosure process.

After entry of the Judgment, a sheriff's sale of the Property was held.  Sokolosky was the only bidder at the sale, and acquired the Property by bidding in the entire amount of the Judgment. Sokolosky subsequently transferred the Property to Communications.  Communications is presently an internet service provider doing business as Atlas Broadband ("Broadband").  Milenkovic is an employee and the chief operating officer of Communications.

*The Bankruptcy Case*

Atlas filed an original petition for relief under Chapter 7 of the Bankruptcy Code with this Court on August 28, 2007.  Steven W. Soulé ("Trustee" or "Soulé") was appointed as trustee.  Soulé is an experienced and capable trustee.  He has filed adversary proceedings, tried adversary proceedings, and settled adversary proceedings on a regular basis since 1988.[3]  In his role as trustee of Atlas, Soulé determined that assets may be available for distribution to creditors.  Upon his request, December 14, 2007, was established as the deadline for filing claims in the case.[4]

---

[3]  The records of this Court, of which the Court takes judicial notice on its own motion, reflect that, as of May 22, 2012, Soulé has acted as trustee in almost 19,000 cases.

[4]  *Docket No. 11.*

4

*The Finley Claim*

On December 14, 2007,  the Finley Claimants filed their proof of claim in the amount of $1,091,787 (the "Finley Claim").[5]  The basis for the claim is identified as "Conversion Business" [sic].  Attached to the Finley Claim is a copy of a petition filed in the District Court of Tulsa County, Oklahoma, in which the Finley Claimants are the plaintiffs, and several individuals and entities, including Atlas, are defendants.  Based upon the documentation attached to the Finley Claim, it appears that the Finley Claim has been in some manner of litigation since 2004.[6]   The Finley Claimants filed an amended claim on March 3, 2010 (the "Amended Finley Claim").[7]  The Amended Finley Claim is also in the amount of $1,091,787, and lists as its basis "Conversion Tortious Interf" [sic].  The Amended Finley Claim contains a cryptic description of its basis:

> Brad Finley and Ryan Finley formed Perry Quality Services, LLC.  The Finleys and Perry quality [sic] Services, LLC developed new, novel, unique, and valuable information regarding wireless communications. The debtor was generally in the same business and falsely induced the creditors to sell a portion of the business of Perry Quality Services, LLC, and they did so. The debtor defrauded the creditors and converted their assets.[8]

No state court pleadings are attached to the Amended Finley Claim.

On December 9, 2009, Milenkovic, as an equity security holder of Atlas, objected to the

---

[5]  *Claim No. 6-1.*

[6]  The Court has been provided with some evidence regarding the history of litigation between Sokolosky, Dominion, Communications, and/or Atlas on one side, and the Finley Claimants on the other.  A detailed recital of that history is not necessary to an understanding of the Court's decision today.  Suffice it to say that the Finley Claimants feel that Sokolosky has taken the business of Atlas from them without proper compensation, and that Sokolosky strongly disagrees.

[7]  *Claim No. 6-3.*

[8]  *Id.*

Finley Claim (the "Claim Objection").  The Claim Objection was filed with the consent and support

of Soulé.  There has been significant litigation regarding the Claim Objection.  On April 29, 2010,

this Court, after notice and a hearing, entered a memorandum opinion and judgment sustaining the

Claim Objection and disallowing the Amended Finley Claim.[9]  That decision was appealed to the

United States District Court for the Northern District of Oklahoma (the "District Court").  On March

8, 2011, the District Court reversed the decision disallowing the Amended Finley Claim, and

remanded the issue of allowance of the Amended Finley Claim for further proceedings.[10]   The

Claim Objection remains pending before this Court.  It need not be resolved in order for the Court

to issue its decision today.

*The Fraudulent Transfer Action*

        On August 25, 2009, Soulé filed a fraudulent transfer action (the "FTA") against Dominion,

Communications, and Sokolosky (collectively "Defendants"), seeking to recover the Property or its

value.[11]  Soulé alleges that the execution of the Note and Security Agreement, coupled with the

Rogers County Foreclosure and the Judgment, constituted a fraudulent transfer.  The Finley

Claimants are not parties to the FTA.

        The FTA was set for trial on May 18, 2011.  A Pre-Trial Order outlining the claims,

defenses, issues to be litigated, and exhibits to be offered was filed on March 4, 2011.[12]  On May 13,

2011, the parties to the FTA announced a settlement (the "Settlement").  Under the terms of the

---

[9]  *Docket Nos. 64 and 65.*

[10]  *Docket No. 80.*

[11]  *Adv. Proc. 09-01077-M.*

[12]  *Adv. Proc. 09-01077-M*, Docket No. 26.

Settlement, Defendants are to pay the Trustee $55,000 in 5 monthly payments of $10,000, followed by a final payment of $5,000. Payments are to begin on the day an order approving the Settlement becomes final. As part of the Settlement, Soulé will assign to the Defendants a claim for contribution that Atlas may have against the Finley Claimants. Soulé ascribes no value to the contribution claim. In addition, Defendants will waive any claim they may have against the bankruptcy estate of Atlas. Upon receipt of the final payment, the FTA shall be dismissed with prejudice. A motion to approve the Settlement was filed on May 26, 2011.[13]

The Settlement has been properly noticed to all creditors and parties in interest. The only objection was filed by the Finley Claimants (the "Settlement Objection").[14] The basis for the Settlement Objection is that the proposed settlement amount "is not a fair and equitable amount and is not in the best interest of the estate." The Finley Claimants requested limited discovery that would "focus on the value of the assets wrongfully acquired by the Defendants at the time of the wrongful conduct and the current value of such assets" – no more, no less.[15]

Ryan Finley ("Ryan"), one of the Finley Claimants, testified that the Court should reject the Settlement. Ryan stated that prior to the filing of the Settlement, he informed Soulé that Atlas had substantial value and that the FTA was worth a large sum of money. After reviewing all of the testimony presented to it, the Court finds that the Finley Claimants were asked repeatedly by Soulé, either directly or through counsel, to supply any information or documentary support for their position on this issue. No such information or support was provided. Ryan claimed to be unaware

---

[13] *Docket No. 82.*

[14] *Docket No. 83.*

[15] *Id.* (emphasis added).

that Soulé was engaged in settlement negotiations with the Defendants.  The Finley Claimants arranged a meeting with Soulé to discuss the bankruptcy case, give their perspective on the value of the FTA, and provide their viewpoint as creditors.  Upon learning of the Settlement, they chose not to attend the meeting.

*The Property as Valued by Soulé*

In 2010, as part of his preparation of the FTA litigation, Soulé engaged an appraiser, Jay Litchfield ("Litchfield"), to place a value on the Property as of the date of its transfer.  Litchfield based his appraisal on a list of assets of Atlas used in the Rogers County Foreclosure.  According to Litchfield's report, the Property included: vehicles, network equipment, office equipment, tools, servers, radio gear (some obsolete), and wireless accessories.  From that inventory list, Litchfield attempted to identify any items that were still being used by Broadband in its business operations (presumably to calculate what assets still existed in the event Soulé chose to recover the Property).  His efforts were hindered by the fact that the descriptions of computers and equipment on the inventory list were very general, often with no detail regarding size/capacity, purchase price, or manufacturer, and the fact that Litchfield performed the appraisal approximately three years after the Property was transferred, at a time when most or all of the technical equipment had become obsolete.  In order to place a value on the Property as of 2007, Litchfield reviewed his own firm's records regarding auction sales of similar types of property from 2007, solicited information about equipment costs from other companies in the business of internet service provision, conducted research via the Internet to find prices for equipment whose description was sufficiently detailed, e.g., NADA values for specific vehicles, and where necessary used current prices to extrapolate a 2007 value.  Based on the foregoing, Litchfield concluded that the Property had a value of $164,645

at the time of its transfer (the "Litchfield Appraisal").[16]

As part of settlement negotiations between Soulé and Defendants, Defendants challenged various aspects of the Litchfield Appraisal.   For example, Soulé was shown that perfected liens were in place on the vehicles at the time they were transferred, which caused Soulé to lower his estimated recovery.  Defendants also argued that some of the assets, such as routers and wireless accessories, were located inside customers homes, and their value should be discounted by the cost of retrieval (which often exceeded its scrap or resale value).[17]  Defendants argued that the Litchfield Appraisal overvalued the Property by more than $135,000.[18]  In addition, Defendants furnished

---

[16]  *See* Defendants' Ex. 13.

[17]  *See* Defendants' Ex. 8.  Soulé testified that Defendants' Exhibit 8 was a document presented to him by Defendants during the settlement negotiations regarding the FTA.

[18]  The deductions can be broken down as follows:

| Item | Litchfield Value | Deduction | Basis for Deduction |
| --- | --- | --- | --- |
| Servers | $4,500 | $4,500 | Servers unusable by 3rd party – only value is scrap value |
| Network Equipment | $15,640 | $14,864 $14,500 | Property located in residences – cost of repossession exceeds value Cost of equipment removal (appears duplicative) |
| Vehicles | $73,500 | $36,100 $12,000 | Prior Liens Vehicles valued at retail instead of wholesale |
| Wireless Accessories | $59,555 | $17,625 | Certain items valued at $25 each can be purchased at a cost of $10 each |
| Office Equipment | $5,175 | $5,175 | Obsolete scanners and printers |

Soulé with an  appraisal of the Property (not including the transferred vehicles), which showed it

to be worth $6,095.[19]  Soulé took all of this information into consideration when determining what

his ultimate recovery might be if he were to litigate and win the FTA.

*Value of the Property in the Eyes of the Finley Claimants*

The only evidence offered by the Finley Claimants as to the value of the Property came in

the form of testimony by Ryan.[20]   Ryan is a Certified Public Accountant.  The vast majority of his

valuation experience relates to the valuation of golf courses.[21]  He has no formal training as an

appraiser or in business valuation.  His testimony did not demonstrate any technical skill or acumen

| | | | |
|---|---|---|---|
| Non-functional radios | $1,060 | $1,060 | Non-functional radios have no value |
| All assets | | $30,000 | Prior lien held by Bank of the Lakes |

*See* Defendants' Ex. 8.  Most if not all of the deductions were based upon analysis conducted by
Milenkovic.  The deductions total $135,824, leaving a value of $28,821.  If one assumes the
$14,500 deduction for equipment removal is duplicative, the number increases to $43,431.

[19]  The Defendants' appraisal was not admitted as an exhibit, and the Court gives it no
weight because there was no expert offered to support it, nor any discussion of the methodology
used or the credibility of the appraiser.  The Court allowed Soulé to testify regarding the amount
of the appraisal in order to understand what information he used in making his decision to settle
the FTA.

[20]  Ryan Finley was designated as an expert in the Pre-Trial Order without objection.  *See*
Docket No. 146. At the hearing in this matter, Defendants objected to allowing him to testify as
an expert on the basis that they did not receive a report prior to the hearing.  The Court overruled
the objection, noting that under Federal Rule of Bankruptcy Procedure 9014(c), Federal Rule of
Civil Procedure 26(a)(2) (disclosures regarding expert testimony) does not apply in a contested
matter unless the court directs otherwise, which it has not done in this matter.

[21] His duties included running a financial analysis pro forma based on achieving a desired
return on investment.  In addition, he has conducted feasibility studies and market studies.  Over
the course of 15 years, he has had some involvement with financial analysis or business
valuation.

10

in the business of providing internet services.  Ryan offered his opinion that Atlas had a value of approximately $1.2 million at the time of the Rogers County Foreclosure.  To reach this conclusion, he employed four separate valuation approaches:  1) direct capitalization; 2) replacement cost; 3) comparable sales; and 4) net cash flow.  Ryan began compiling the information for his analysis during the week of the hearing.  In order to reach his valuation estimate, Ryan relied on the transcripts of two depositions of Milenkovic and one of Sokolosky, "part of the documents from yesterday" regarding the public auction of the Property,[22] Atlas's Quickbooks financial statements, a balance sheet prepared for Broadband as of December 31, 2007, and a cap rate study from the Nevada Department of Taxation.

Ryan testified that his valuation was not based on the Property (i.e., the assets transferred), but was instead a "going-concern" valuation of Atlas's business.  He did not believe that Atlas was insolvent at the time of the Rogers County Foreclosure, and therefore he did not consider that in his valuation.  He did not consider the significance or involvement of Milenkovic as a vital input in Atlas's operations or the impact on the ability of the business to continue in Milenkovic's absence.

Under the direct capitalization approach, Ryan used a capitalization rate for the telecommunications industry acquired from a study by the Nevada Department of Taxation.  He calculated Atlas's market value by dividing its net income by the capitalization rate.  He testified that this is a standard approach used by appraisers.  He did not inform the Court what figure he used for net income, or its source; nor did he inform the Court what number he used for the capitalization

---

[22]  Ryan testified on the second day of a two-day trial.  He referred to two depositions of Milenkovic, but only one deposition of Milenkovic was offered into evidence.  The documents referenced by Ryan were otherwise unidentified.

rate, or exactly what market value he ascribed to Atlas as a result of this approach.[23]  To conduct his analysis under the replacement cost approach, Ryan used a balance sheet of Broadband as of December 2007, which showed total assets of $1,060,885.08.[24]  Ryan testified that this number reflects what it would cost to replicate "this business" in 2007.[25]  The number does not include the value of customer contracts, which he would ascribe value to, although he did not state how much. Ryan gave no weight to the fact that the balance sheet he relied upon showed liabilities of $975,917.61, nor did he explain why he ignored those liabilities.

Under the comparable sales approach, Ryan looked at two transfers of Atlas in 2007.  The first transfer being the Rogers County Foreclosure, where Sokolosky pledged his judgment, and the second being when Communications purchased various assets from Sokolosky.[26]  Ryan made no statement of the value estimate that resulted from this approach.  He stated that he felt the value provided a floor for valuation because of his belief that these transfers were not arm's length, and therefore this approach did not reflect a fair market value.[27]

Finally, Ryan described a net cash flow approach, wherein he calculated that most businesses expect a 10%-12% return on investment.  He calculated that it would take $1 million in investment

---

[23]  As with all of the valuation testimony provided by Ryan, he appeared to be testifying from a document that he seemed to assume that the Court was also reading.  The Finley Claimants did not offer that document into evidence.

[24]  Finley Claimants' Ex.  13.

[25]  Both Ryan and counsel for the Finley Claimants threw around the term "this business" with regularity, but were never very clear whether they were discussing Atlas or Broadband.

[26]  *See* Deposition of Noble Sokolosky, Defendants' Ex. 6, at 8, lines 9–11.

[27]  It appears that Ryan attempted to arrive at a value under the comparable sales approach using two "sales" (the sale in the Rogers County Foreclosure and the sale from Sokolosky to Communications) that he considered fraudulent.  A most curious approach.

to generate $120,000 in revenue with a 10% return, and that it would take $1.2 million in investment to generate $120,000 in revenue with a 12% return. He did not explain the source or relevance of the $120,000 figure.

Despite the fact that Atlas ceased operations in 2007 after the Rogers County Foreclosure and the subsequent filing of this bankruptcy case, Ryan believes that Broadband is merely a continuation of the business of Atlas. He bases his opinion on the fact that Atlas was in the business of providing broadband internet services, and Broadband offers the same services. On cross-examination, Ryan admitted that he did not have knowledge of how many of the assets from the Rogers County Foreclosure were later transferred to and utilized by Broadband. The primary source of his information regarding Broadband came from depositions of Milenkovic and Sokolosky conducted during the FTA litigation. When asked why he believes the value of Broadband in 2010 is relevant to the value of the Property at the time of its transfer, Ryan stated that it was because he had better data for Broadband in 2010 than he could find for Atlas in 2007, and he therefore used the Broadband 2010 data to extrapolate a value for Atlas in 2007. He testified that his valuation of Broadband in 2010 serves to verify that his $1.2 million valuation of Atlas in 2007 is correct. Ryan also testified that any deficiencies in his analysis are because he was denied access to critical financial information regarding Debtor during the course of discovery in this matter.[28]

---

[28] Ryan's claim—that he was denied information—is a recurring theme throughout this contested matter. In fact, Ryan went so far as to suggest in his testimony that he was denied access to information by the Court. There is no doubt that there were numerous discovery disputes in this case. A detailed summary of those disputes and, to some extent, their resolution, is found in an Order entered by this Court at Docket No. 136. In addition, the record reflects a detailed telephonic bench ruling on another discovery dispute (Docket Nos. 113 and 114), a supplemental order allowing additional discovery (Docket No. 125), and a final order denying a motion to compel discovery as untimely (Docket No. 142). To the extent the Finley Claimants were "denied" discovery in this matter, it was because they did not comply with the Federal

To the extent the Conclusions of Law contain any items that should more appropriately be considered Findings of Fact, they are incorporated herein by this reference.

### Conclusions of Law

As we begin, it is important to understand the scope of what is before the Court and the proper inquiry that the Court must make. The issue before the Court is approval of the Settlement. We are not here to consider every dispute that may have ever existed between the Defendants and the Finley Claimants.  Whatever rights the Finley Claimants may have to pursue Sokolosky, Dominion, Communications, and/or Milenkovic are not at issue today.  Soulé acknowledges that his remedies in the FTA are limited to recovery of the assets at issue or their value.  He is not entitled to some fashion of broad based, all-encompassing equitable relief.

A court's inquiry in deciding whether to approve a compromise is limited.  In evaluating a proposed compromise or settlement, it is the court's duty to make an "informed [decision] based upon an objective evaluation of developed facts."[29]  Courts have developed factors for consideration of whether to approve settlements.  In general, the court must determine whether the settlement is fair and equitable, and in the best interest of the estate.[30]  In considering whether a settlement or compromise is fair and equitable and in the best interest of the estate, the court should consider these four items:

> (1)    the probable success of the underlying litigation on the merits;

> (2)    the possible difficulty in collection of a judgment;

---

Rules of Bankruptcy Procedure and Federal Rules of Civil Procedure or because the discovery they sought was overly broad, untimely, or otherwise improper.

[29] *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir. 1989).

[30] *In re Kaiser Steel Corp.*, 105 B.R. 971, 976 (D. Colo. 1989).

(3)      the complexity and expense of litigation; and

(4)      the interests of creditors in deference to their reasonable views.[31]

Generally, the court will lend deference to a trustee's judgment regarding the beneficial nature of

a proposed settlement. The court should evaluate whether a trustee's actions are "within the universe

of reasonable actions," and assess "whether the settlement falls below the lowest point in the range

of reasonableness."[32]   The court is not to substitute its own judgment for that of the trustee.  In order

to do their jobs, bankruptcy trustees must be allowed to exercise their judgment in a reasonable

fashion.

*Probability of Success*

        For purposes of its decision, the Court finds it likely that Soulé would prevail upon the merits

of the FTA.  Section 548(a)(1)(B) provides:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit
> of an insider under an employment contract) of an interest of the debtor in property,
> or any obligation (including any obligation to or for the benefit of an insider under
> an employment contract) incurred by the debtor, that was made or incurred on or
> within 2 years before the date of the filing of the petition, if the debtor voluntarily
> or involuntarily–
> . . .
>
>> (B)(i) received less than a reasonably equivalent value in exchange for such
>> transfer or obligation; and
>>
>> (ii)(I) was insolvent on the date that such transfer was made or such
>> obligation was incurred, or became insolvent as a result of such transfer or

---

[31] *In re Kopexa Realty Venture Co.*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997). *See also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968).

[32] *In re W.T. Grant, Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (internal citation omitted);  *In re Dennett*, 449 B.R. 139, 145 (Bankr. D. Utah 2011).

obligation[.][33]

Under this section, Soulé has the burden of proving that:

(1) Atlas had an interest in the property described in the Security Agreement;

(2) a transfer of that interest occurred within two years of the filing of the bankruptcy petition;

(3) Atlas was insolvent or was rendered insolvent as a result of the transfer; and

(4) Atlas received less than a reasonably equivalent value in exchange for the transfer.[34]

Once these elements are proven, constructive fraud is established.[35]

Atlas had an ownership interest in the Property.  The Security Agreement was executed within two years of the filing of Atlas's bankruptcy petition.  Prior to the execution of the Security Agreement, Sokolosky did not have a security interest in any assets owned by Atlas.  The parties to the FTA stipulated that Atlas was insolvent "at all times relevant" to the FTA.[36]  Moreover, the Bankruptcy Appellate Panel of the Tenth Circuit, in affirming an opinion issued by this Court, held that the securing of previously unsecured debt does not constitute "reasonably equivalent value" for purposes of § 548(a)(1)(B).[37]  The proposition seems especially true here where Sokolosky provided

[33] § 548(a)(1)(B).  This section was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005), which extended the reachback period of § 548 to two years.  That change is effective for cases commenced on or after April 21, 2006. *See id.* § 1406(b)(2).

[34] *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994).

[35] *Official Comm. of Unsecured Creditors v. Liberty Sav. Bank, FSB (In re Toy King Distrib., Inc.)*, 256 B.R. 1, 141 (Bankr. M.D. Fla. 2000).

[36] Defendants' Ex. 14 at 5.

[37] *Stillwater Nat'l Bank & Trust Co. v. Kirtley (In re Solomon)*, 299 B.R. 626, 633-38 (10th Cir. BAP 2003).

no consideration, not even an extension of a due date, in exchange for execution of the Security Agreement.[38]

The fact that Soulé is likely to prevail on the law, however, does not end the inquiry.  The next question is, if Soulé wins, what does he win?  In order to answer this question, we must focus on the remedies available under § 550.

*Potential Recovery*

The measure of recovery available to a bankruptcy trustee is set out in § 550(a).

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –
>
>> (1)  the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>> (2)  any immediate or mediate transferee of such initial transferee.[39]

While the determination of what property was transferred is an issue of fact, valuation under § 550 of that property is an issue of law.[40]  The specific valuation method applied and the time at which the value is measured depends on the facts and circumstances of each case.[41]  The Finley Claimants rely on the general proposition that "[t]he Trustee here is entitled to recover from the [Defendants]

---

[38]  The Note was a demand note.  To the extent the Note and Security Agreement were deemed valid,  Sokolosky had the right to demand payment and enforce the Security Agreement the moment it was executed.  It is difficult to see any value, let alone reasonably equivalent value, provided to Atlas in this transaction.

[39]  § 550(a).

[40]  *Rupp v. Markgraf*, 95 F.3d 936, 938 (10th Cir. 1996) (interpretation and application of § 550 present purely legal issues).

[41]  *See Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty Res., Inc.)*, 354 F.3d 1246, 1267 (10th Cir. 2004).  *See also Malloy v. Brazeal (In re Callahan)*, 2008 WL 918713 at *4 (Bankr. N.D. Okla. April 1, 2008) (unpublished decision).

the fair market value of the property transferred."[42]  On this point, all parties, as well as the Court,

seem to agree.  Any consensus is lost when each party defines "fair market value."  The Defendants

assert that the Court should value the Property as the amount that was depleted from the estate upon

transfer to the Defendants, and the amount that the Trustee could have realized if the Property had

not been transferred.[43]  The Finley Claimants ask the Court to ignore the transfer of the Property in

the Rogers County Foreclosure, and instead value "the business" of Atlas as if it were still in

business—a "going concern value," if you will.[44]

The Defendants assert that even if the Property had remained in the estate on the petition

date, Soulé could not have operated the business of Atlas as a going concern.  Soulé readily admits

this fact.  Without the knowledge, skills, and intellectual property provided by Milenkovic, Atlas

was little more than a collection of routers, radios, and servers.  Milenkovic made it work.

Milenkovic testified that he would refuse to work for Soulé to keep the business running, and Soulé

---

[42]  Finley Claimants' Trial Brief, *Docket No. 150*, at 2 (citing 5 Collier on Bankruptcy ¶ 550.02[3][a] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.); *Slutsky v. Michel Tire Co. (In re Vann)*, 26 B.R. 148 (Bankr. S.D. Ohio 1983); *Still v. Hudson (In re Hudson)*, 28 B.R. 876 (Bankr. E.D. Tenn. 1983); *Federman v. Falcone (In re Nevada Implement Co.)*, 22 B.R. 105, 106–07 (Bankr. W.D. Mo. 1982)).

[43]  *See Active Wear, Inc. v. Parkdale Mills, Inc.*, 331 B.R. 669 (W.D. Va. 2005).

[44]  Not content to value the business of Atlas at the time of the transfer, the Finley Claimants believe the Court should also consider the fact that Communications operates Broadband as a successful business today, and should somehow use that fact to attribute a higher value to the business of Atlas.  Finley Claimants' Trial Brief, *at Docket No. 150*, at 2–5.  While the Court agrees with the passage cited by the Finley Claimants that "the time at which the value is measured depends upon the circumstances of each individual case," *Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty Res., Inc.)*, 354 F.3d 1246, 1267 (10th Cir. 2004), the Court rejects the Finley Claimants' application of this principle.  Because the Court finds that the Property consists of depreciating assets—and not an operating business—it is appropriate to value the Property as of the time of the transfer.  *See Tidwell v. Chrysler Credit Corp. (In re Blackburn)*, 90 B.R. 569, 573 (Bankr. M.D. Ga. 1987) (cited with approval in *In re Integra Realty Res., Inc.*, 354 F.3d at 1267).

admitted that Atlas had no employment contract or other legal carrot to compel Milenkovic to stay. Soulé would have had no choice but to liquidate or abandon the Property had it been recovered.  On that basis, the Defendants argue that the fair market value of the Property—and what the Trustee would be entitled to recover in the FTA litigation—is the liquidation value of the property.[45]

The Court rejects the argument that Atlas continued to do business after the Rogers County Foreclosure and continues to do business today under the name Broadband.  The Finley Claimants presented no evidence to support this allegation.  Even if the Court were to value Atlas as a going concern instead of valuing the Property, the result is unchanged.  The Finley Claimants assert that at the time of the Rogers County Foreclosure, a buyer would have willingly paid $1.2 million in exchange for a 100% equity ownership in Atlas.  The evidence is to the contrary.  There is no evidence of a willing buyer for Atlas in 2007.  Both Milenkovic and Soulé testified that Atlas was functionally insolvent at the time of the Rogers County Foreclosure.  All that kept its doors open was the perpetual infusion of cash from Sokolosky.  Without this cash infusion, Atlas would not have been able to make payroll, pay taxes, or continue operations.  It would have been forced to cease operations.  The fact that Atlas had not yet defaulted on any debt or payment obligations does not alter the conclusion that Atlas was functionally insolvent.[46]

The Settlement Objection is dependent upon Ryan's testimony regarding the value of Atlas in 2007.  After careful review, the Court finds Ryan's qualifications and analysis wholly

---

[45]  *Id.* at 672 ("Instead, 'fair market value' refers to the value that the debtor/bankrupt could receive for the property in a liquidation sale.").

[46]  *See Gillman v.  Scientific Research Prods. Inc. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 556–57 (10th Cir. 1995) ("it is of little import that Mama D'Angelo was current on all of its major debts and payments.  This is not the test of insolvency, nor is it the test of a going concern.").

unpersuasive.  He is not an appraiser.  He is a CPA.  He has no experience in valuing a technology company.  His experience is rooted in in-house valuation of golf courses.  He is not unbiased—he claims a direct stake in the outcome of this contested matter.  His analysis was assembled days before the hearing on approval of the Settlement.   In many instances, Ryan's conclusions are unsupported.  For example, although Ryan used a capitalization in his approach to value the business, he did not disclose the capitalization rate used, how he reached his net income figure, or what role the capitalization rate played in his final conclusion as to value.  Moreover, even if Ryan had adequately explained his conclusions, if the Court were convinced his opinion was unbiased, and if the Court believed that in-house experience valuing golf courses qualified one to value an internet service provider, he fails to ascribe any value to Milenkovic's contribution to the business.  Milenkovic played a pivotal role in the operation of Atlas, and continues to do so with Communications/Broadband.  Without Milenkovic, there is no business.  Ryan ignores this fact, and to do so is fatal to his analysis, even if one overlooks all its other shortcomings.

The valuation advanced by the Finley Claimants ignores reality.  "Bankruptcy courts have consistently held that 11 U.S.C. § 550 is designed to restore the estate to the financial condition that would have existed had the transfer never occurred."[47]  If Soulé prevails in the FTA, he cannot do more than he could have done if the assets remained in the estate when the petition was filed.  He cannot operate the business of Atlas without Milenkovic.  He cannot compel Milenkovic to devote his time and talents to Atlas.  He cannot force the customers of Atlas to continue to do business with him.  He can recover the <u>assets</u> fraudulently conveyed or their value—no more, no less.

---

[47]  *Rodriguez v. Drive Fin. Servs., L.P. (In re Trout)*, 609 F.3d 1106, 1112 (10th Cir. 2010)  (*quoting Official Comm. of Unsecured Creditors v. Citicorp N. Am., Inc. (In re TOUSA, Inc.)*, 422 B.R. 783 (Bankr. S.D. Fla. 2009)).

As legal support of their position, the Finley Claimants rely upon three cases. Unfortunately, none of these cases suggest that a court should utilize the concept of "going concern value" as argued by the Finley Claimants. In *Slutsky v. Michel Tire Co. (In re Vann)*,[48] the defendant sold inventory to the debtor on credit, then subsequently removed that inventory from the debtor's premises. After a determination that defendant received a preference within the meaning of §547(b), the issue before the court was the amount of the trustee's recovery. The trustee claimed he was entitled to the amount the debtor was billed by the defendant for the inventory, while the defendant claimed that the trustee's recovery should be reduced by the profit that the defendant would have made on the sale, or, in the alternative, to a return of the actual inventory or identical items. The court determined that the defendant must return to the trustee the actual inventory or identical items because there was no evidence of the market value of the inventory, which the court defined as "what the trustee might obtain were he to offer the [inventory] for sale."[49] There was no suggestion that the trustee was entitled to the value of an ongoing business.

In *Still v. Hudson (In re Hudson)*,[50] a car was transferred for inadequate consideration from the debtor to the defendant within one year of the debtor's bankruptcy petition. Following the transfer, the defendant traded in the vehicle. The trustee argued that he was entitled to recover the value of the car and offered the bill of sale showing the trade-in value minus the payoff of lien debt as proof of the car's fair market value. The court held that the trustee should recover the net equity of the vehicle as demonstrated by the bill of sale because no other evidence was offered as to the

---

[48]   26 B.R. 148 (Bankr. S.D. Ohio 1983).

[49]   *Id.* at 149.

[50]   28 B.R. 876 (Bankr. E.D. Tenn. 1983).

21

value of the car.  Again, this case has nothing to do with the concept of the valuation of a business as a going concern.

Finally, in *Federman v. Falcone (In re Nevada Implement Co.),*[51] a creditor repossessed equipment from a debtor with full knowledge of the bankruptcy trustee's claim of right to the equipment.  The court determined that the trustee was entitled to recover the equitable interest in the equipment, which it defined as the difference between the market value of the equipment and the value of the creditor's encumbrance.  The court relied on evidence presented at a previous trial regarding the property, which listed the wholesale and retail prices of the equipment, to ascertain the amount that the creditor must turn over to the trustee.  The case had nothing to do with the valuation of a business.

The Court concludes that even if the Property had remained in the estate as of the petition date, Soulé did not have the expertise to operate Atlas as an internet service provider.  Nor was there a strong likelihood that Soulé could have found a buyer for Atlas as a going concern without the cooperation and participation of Milenkovic.[52]  Under the facts of this case, the best measure of the fair market value of the Property at the time of the transfer is the value that could have been realized by Soulé in a liquidation sale of the Property.  While not perfect, the best evidence of that value presented to the Court is the Litchfield Appraisal.  The Court also believes that many of the deductions from the Litchfield Appraisal suggested by the Defendants, such as the deduction for prior liens on the motor vehicles, the costs of recovery of equipment located in customers' homes,

---

[51] 22 B.R. 105 (Bankr. W.D. Mo. 1982).

[52] The Finley Claimants have suggested that such a buyer surely existed, but offered no evidence to support their assertion.

and the deductions based upon functional obsolescence of the Property, are reasonable and that it was reasonable for Soulé to consider those deductions as part of his settlement analysis.

*Difficulty in Collection*

The willingness of a party to settle, as well as the amount of a settlement, may well be influenced by the ability of a prevailing party to collect upon a judgment.  If a judgment is uncollectible or minimally collectible, prevailing at trial becomes little more than a pyrrhic victory. Soulé, Sokolosky, Dominion, and Communications have stipulated that Soulé would have no difficulty collecting any judgment this Court might award.[53]   Accordingly, collection of the judgment has no bearing upon approval of the Settlement.

*Complexity and Expense of Litigation*

Soulé testified that a trial of the FTA would result in additional expense to the estate of between $10,000 and $20,000.  The Court finds this to be a reasonable estimate.  Given the limited amount that Soulé could expect to recover if he prevailed, this factor weighs in favor of approval of the Settlement.

*Interests of Creditors*

Notice of the Settlement was sent to all creditors and parties in interest in Atlas's bankruptcy case.  The only objection was advanced by the Finley Claimants.  No other creditors have voiced opposition to the Settlement.  As noted above, the objection raised by the Finley Claimants is based upon an incorrect proposition: namely, that the Trustee is entitled to recover well in excess of $1 million in the FTA.  The question is whether, when a court has determined that a proposed settlement falls within the range of reasonableness, an objection by a creditor warrants disapproval

---

[53]  *Pretrial Order, Docket No. 146*, Section II(10).

of the settlement.

> Courts that have faced this issue have answered the question with a simple "no."

> There is no *per se* rule that the views of a committee or other creditors are dispositive on the reasonableness of a settlement. A *per se* rule would unduly expose the Debtors to the demands of creditors preferring to risk estate assets in a litigation lottery or litigate under blackmail or strong-arm strategies. Instead, a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the balance of the *Martin* factors, including the paramount interests of creditors, weighs in favor of settlement.[54]

Where, as here, the Trustee has met his burden regarding the reasonableness of a settlement, a single objection based upon a flawed premise is insufficient to upset the apple cart.

*Review of All Factors*

If one considers all of the factors, we have a fraudulent transfer action in which the Trustee is likely, but not guaranteed, to prevail. We have Defendants who can pay any judgment the Court would render. The Trustee anticipates a cost of between $10,000 to $20,000 to bring this matter to completion. Though imperfect, the best evidence of the value of the Property before the Court is found in the Litchfield Appraisal. Assuming those values are correct, it is not unreasonable to assume that certain deductions, such as for the prior liens on the motor vehicles, the costs of retrieving equipment from residences, and expenses of sale, may be deducted from that amount. It is also reasonable to consider the vagaries and risks involved with an auction of property from a bankruptcy estate. It is certainly within the realm of possibility that the Trustee could prevail and obtain a judgment well below $100,000. The question before the Court is whether a settlement which will pay the estate approximately $55,000.00 within six months of becoming final without

---

[54] *In re Capmark Financial Group, Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) (and cases cited therein).

the necessity of further litigation expense in the FTA is within the proper discretion of the Trustee and should be approved.

The only objection to the settlement is based upon two flawed premises:  (1) that the Trustee is entitled to recover an amount far greater than the value of the Property; and (2) approval of the Settlement will deny the Finley Claimants their "day in court."[55]  The Court finds that the Settlement is within the proper discretion of the Trustee, is fair, reasonable, and in the best interest of the estate, and should be approved.

## CONCLUSION

The Settlement is approved.  A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 24th day of July, 2012.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6345.9

---

[55] This argument was made repeatedly by counsel for the Finley Claimants while the Settlement was pending and at the hearing on its approval.  This Court fails to see the merit of the argument.  What is presently before the Court is the Settlement and its effect upon (namely, resolution of) the FTA.  None of the claims alleged by the Finley Claimants against the Defendants are on the table.  The Court makes no finding regarding the merits of those claims, or whether they even may still be prosecuted.  That is a matter left for another day to another Court.  The Settlement and/or the FTA are not the proper procedural vehicle for the Finley Claimants to raise claims against the Defendants.